UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                                                  Case No: 8:23-cr-147-KKM-CPT

CLEVELAND SANDERS,

    Defendant.
_____

# ORDER

A grand jury indicted Cleveland Sanders—a felon—for possessing a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8), *see* Indictment (Doc. 1), after he attacked a law enforcement officer and attempted to flee the scene of a traffic stop. Sanders now moves "to suppress any evidence obtained during [the allegedly] unconstitutional traffic stop and the resulting warrantless search." Mot. to Suppress (MTS) (Doc. 26) at 1. The sole basis for his motion is that the traffic stop violated the Fourth Amendment because the police "did not have a legal basis to stop [him]." *Id.* at 6. I disagree.

I.   FACTUAL FINDINGS[1]

On January 3, 2023, Clearwater Police Officer Zachary Zarra was working a patrol shift that included the intersection of North Martin Luther King, Jr., Avenue (North MLK) and Grant Street. Hr'g Tr. at 6:22–7:6. At around 8:55 p.m., Zarra was traveling northbound on North MLK about 100 feet south of the intersection when he observed a black Ford Ranger driven by Sanders approach the intersection and "travel[] in one fluid motion completely through the intersection without stopping." *Id.* at 9:18–10:19. Zarra further observed that, as the Ranger approached and transitioned through the intersection, its rear brake lights did not activate. *Id.* at 10:22–11:3.

Zarra testified that he had "an unobstructed view of the interconnection of Martin Luther King Avenue and Grant Street." *Id.* at 11:4–9; *see also id.* at 51:8–11. At the suppression hearing, Sanders presented photographs and testimony from an investigator suggesting that a white picket fence and shrub partially obscured the view of the intersection from Zarra's approximate location. *Id.* at 40:13–49:13; Def. Exh. 5. But the picket fence was not solid, Hr'g Tr. at 47:22–48:3, the picture of the shrub was taken two weeks before the hearing and more than ten months after the underlying incident, *id.* at 43:10–14, 48:7–9, and the photograph was taken from the sidewalk and not the road, *id.*

---

[1] The facts recounted here are based on witness testimony and video evidence presented at the evidentiary hearing on November 22, 2023.

at 47:4–21. Based on these facts, I credit Zarra's testimony that his view was unobstructed and that he observed what he testified to.

After observing the first infraction Zarra did not immediately initiate a traffic stop, instead following the Ranger along Grant Street. *Id.* at 15:7–25. Zarra also entered the Ranger's Georgia tag into his squad car's computer to retrieve records using a law enforcement program called TriTech. *Id.* at 16:1–19, 31:3–14, 37:16–38:11. During this time, he observed a second traffic infraction—the Ranger "stopped well past the stop sign pole, with [its] bumper in the intersection" of Grant Street and Pennsylvania Avenue. *Id.* at 16:20–17:10. Zarra continued to follow Sanders for a short time thereafter, eventually engaging his emergency lights as the Ranger pulled into a parking spot at a Discount Food Store just west of the intersection of North Myrtle Avenue and Marshall Street. *Id.* at 17:11–19:7, 23:24–24:2; Body-Worn Camera Video (BC) at 20:50:30–45.[2]

After coming to a stop Sanders opened the driver-side door, exited the Ranger, and walked a few paces towards Zarra, who ordered Sanders to return to his vehicle. Hr'g Tr. at 23:24–24:6.; BC at 20:50:40–50. Although Zarra had to reiterate the order several times, Sanders eventually complied, sitting down in the Ranger's driver-side seat with the door still open. Hr'g Tr. at 23:24–24:12; BC at 20:50:45–52. As Zarra "approached the open

---

[2] Citations to Zarra's body-worn camera footage refer to the video's internal timestamp, located in the top right-hand corner of the frame.

door" to ask for Sanders's identification, he "observed a large handgun in the [driver-side] door jamb." Hr'g Tr. at 24:10–14; BC at 20:50:51–58. Zarra testified that the firearm, a Hi-Point .45 caliber pistol, was stored in a pocket on the Ranger's driver-side door "beneath the area where [a driver would ordinarily] roll up the window." Hr'g Tr. at 28:5–21. Body-worn camera footage from after Sanders's arrest corroborates that testimony. BC at 20:54:07–25, 20:58:25–45. Zarra instructed Sanders not to move but eventually "had to place [a] hand on [Sanders's] shoulders to try and seat him back down." Hr'g Tr. at 24:17–22; BC at 20:50:58–20:51:06. Sanders then initiated a physical altercation by grabbing Zarra's patrol vest and attempted to flee on foot. Hr'g Tr. at 24:15–26:3; BC at 20:51:06–20:51:33. Sanders "struck [Zarra] several times in the face [with] overhand punches," Hr'g Tr. at 25:22–23, and dislodged Zarra's radio, *id.* at 28:22–29:2, but Zarra eventually managed to subdue Sanders using a taser and took him into custody, Hr'g Tr. at 25:17–26:3; BC at 20:51:33–20:52:30. Additional officers rapidly arrived on the scene, and within a few minutes, Zarra and his fellow officers searched the Ranger and seized the firearm. *See, e.g.*, BC at 20:58:25–45.

## II.   LEGAL STANDARDS

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.

4

A traffic stop constitutes a Fourth Amendment seizure of the vehicle's occupant "since they [are] not free to exit the vehicle or continue on their journey." *Johnson v. Nocco*, 83 F.4th 896, 902 (11th Cir. 2023) (footnote omitted); *see also Arizona v. Johnson*, 555 U.S. 323, 332 (2009) (explaining that occupants have standing to challenge the constitutionality of a traffic stop because they are seized "from the moment [a car stopped by the police comes] to a halt on the side of the road" (alterations in original) (quotations omitted)). A stop is constitutional if the officer had reasonable suspicion to believe that criminal activity has occurred, is occurring, or is about to occur. *United States v. Campbell*, 26 F.4th 860, 880 (11th Cir. 2022) (en banc). "In other words, an officer making a stop must have a particularized and objective basis for suspecting the person stopped of criminal activity." *Id.* (quotations omitted). Even a minor traffic violation is enough. *Id.*

To object to a search, a defendant must have a common-law property interest or a reasonable expectation of privacy in the area searched. *Florida v. Jardines*, 569 U.S. 1, 5 (2013). A defendant "bears the burden of proving . . . that he had a legitimate expectation of privacy." *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980). "If the accused successfully establishes an expectation of privacy, the burden then shifts to the government to prove that the search was reasonable based upon a recognized exception to the warrant requirement." *United State v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008).

## III. ANALYSIS

Sanders moves "to suppress any evidence obtained during [the allegedly] unconstitutional traffic stop and the resulting warrantless search," arguing that Zarra lacked a lawful basis to initiate the stop. MTS at 1. The key piece of evidence in a § 922(g)(1) prosecution, of course, is the firearm that Sanders was indicted for unlawfully possessing. *See* Indictment at 1. Because Fourth Amendment standing is not at issue, *see* Hr'g Tr. at 4:22–25, I begin by analyzing whether Zarra had a lawful basis to initiate the stop.

The parties' arguments on reasonable suspicion turn on a pair of alleged traffic infractions—first at the intersection of North MLK and Grant, and second at the intersection of Pennsylvania and Grant. Either infraction, if it occurred, is enough to independently give rise to reasonable suspicion of a violation of Florida traffic law. *See* FLA. STAT. § 316.123 (governing drivers' conduct at intersections); *Campbell*, 26 F.4th at 880 (evidence of minor traffic infractions is enough to provide reasonable suspicion).

I credit Zarra's account of the events leading up to Sanders's arrest with respect to both infractions. Although Sanders claims that Zarra's view of the intersection of North MLK and Grant would have been obstructed by a picket fence and a shrub, the only hard evidence offered in support of that proposition is a photograph taken almost ten months after the underlying incident. And even if the photograph had been taken contemporaneously, it (1) shows a view of the intersection from the sidewalk and not the

road, necessarily capturing a different perspective than would have been available to Zarra from the driver's seat of his patrol car, and (2) demonstrates, at most, partial obstruction. This sparse evidence cannot overcome Zarra's credible testimony that he observed Sanders running the stop sign. As to the other infraction, Sanders does not even try to challenge Zarra's observation of a second moving violation at the intersection of Pennsylvania and Grant. Hr'g Tr. at 32:4–11. Either independently or together, these observations were sufficient to initiate a traffic stop based on reasonable suspicion that Sanders had violated Florida traffic law. *See* § 316.123; *Campbell*, 26 F.4th at 880.

    Sanders developed no other arguments as to why the firearm ought to be suppressed other than that the traffic stop was unconstitutional. His seven-page suppression motion simply asserts that seizing the firearm violated the Fourth Amendment because "[t]he [traffic stop] was without reasonable suspicion and so was illegal." MTS at 5. Thus, he says, "[t]he illegal [traffic stop] led to the warrantless search that followed, and the physical evidence collected during that search. This evidence is the fruit of [Officer Zarra's] illegal seizure of Mr. Sanders, and so should be suppressed." *Id.* Accordingly, the United States has also limited its response to the issue of justification for the stop. *See generally* Resp. to MTS (Doc. 30). As I explained above, this argument fails because Zarra had reasonable suspicion to stop Sanders for violating Florida traffic law.

Any additional arguments that the firearm should be suppressed even though the stop was lawful would necessarily need to be presented in a second, untimely suppression motion. *See* Pretrial Discovery Order (Doc. 20) at 5 (requiring that motions be filed within 30 days of receiving Rule 16(a) discovery from the United States); FED. R. CRIM. P. 12(b)(3), (c) (allowing district courts to "set a deadline for the parties to make pretrial motions," including motions to suppress evidence). I may consider such an untimely motion "if the [defendant] shows good cause." FED. R. CRIM. P. 12(c)(3). But Sanders did not provide any explanation for failing to brief these issues at the suppression hearing, much less show good cause. Rather, he conceded that the motion's failure to discuss whether the firearm should be suppressed, assuming the stop was lawful, was the result of an "omission" by counsel. Hr'g Tr. at 26:24. But "[n]either a strategic decision nor inadvertence constitutes good cause" under Rule 12(c)(3). *United States v. Andres*, 960 F.3d 1310, 1316 (11th Cir. 2020). Because any additional arguments that the firearm should be suppressed would need to be presented in an untimely motion and Sanders has failed to show good cause, those arguments have been forfeited.

Even if they were not forfeited, however, and even if no exception to the warrant requirement could have justified the search of the Ranger and the seizure of the firearm, Sanders would still not be entitled to an order suppressing the firearm. After Sanders

attacked Zarra and was arrested while attempting to flee, the lawful seizure of the firearm—still plainly visible at the scene in the Ranger's driver-side door jamb—became inevitable.

"One of the exceptions to the exclusionary rule is for inevitable or ultimate discovery, which allows for the admission of evidence that would have been discovered even without the unconstitutional source. This exception is akin to the harmless error rule that is applied for constitutional violations generally." *United States v. Watkins*, 13 F.4th 1202, 1210 (11th Cir. 2021) (quotations and citations omitted). The rationale of the doctrine is that "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received." *Id.* (quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984)). The Eleventh Circuit recently summarized this rule as follows:

> Illegally obtained evidence is admissible under the ultimate discovery exception if the government can make two showings. One is a showing by a preponderance of the evidence that if there had been no constitutional violation, the evidence in question would have been discovered by lawful means. Absolute certainty is not required, only a showing that it is more likely than not the evidence would have been discovered without the violation.

*Id.* at 1211 (citations omitted).

> The other requirement the government must meet is that the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct. Active pursuit in this sense does not require

9

> that police have already planned the particular search that would obtain the evidence but only that the police would have discovered the evidence by virtue of ordinary investigations of evidence or leads already in their possession.

*Id.* (cleaned up).

Zarra's testimony, corroborated by his body-worn camera footage, shows that Sanders attacked a law enforcement officer and then attempted to flee from a lawful traffic stop. *See* Hr'g Tr. at 24:15–26:3; BC at 20:51:06–20:51:33. After Sanders was subdued, he was arrested at the scene. *See id.* at 20:53:00–10. Assuming in Sanders's favor without deciding the forfeited question of whether officers' seizure of the firearm was justified by an exception to the warrant requirement, suppression would still be inappropriate because a lawful seizure under the plain view doctrine would have inevitably occurred once police learned of Sanders's status as a felon, which they most certainly would have discovered during his arrest. The plain view doctrine provides that "the warrantless seizure of an item is permissible where (1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent." *United States v. Folk*, 754 F.3d 905, 911 (11th Cir. 2014) (quotations omitted). The first element is satisfied because Zarra was lawfully located at the scene of first a lawful traffic stop and then later a lawful arrest. Zarra possessed a lawful right of access to the Ranger to collect

identification information and address potential officer safety concerns as part of the stop. *See United States v. Rodriguez*, 575 U.S. 348, 355–56 (2015). Once Zarra, who remained on the scene to help process Sanders's arrest, inevitably learned "that [Sanders] was a convicted felon [during the course of the arrest] and reasonably believed that the firearms belonged to him, the second prong of the plain view doctrine was satisfied." *Folk*, 754 F.3d at 912; *see also id.* ("A firearm that reasonably appears to be in the possession of a convicted felon qualifies as contraband—and is therefore subject to seizure under the plain view doctrine."). Thus, I conclude that the United States has shown "by a preponderance of the evidence that if there had been no constitutional violation, the [firearm] would have been discovered by lawful means." *Watkins*, 13 F.4th at 1211 (citations omitted).

The same facts show that "the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of [any potentially] illegal conduct." *Id.* (quotations omitted). The initial stop and Zarra's subsequent request that Sanders produce identification were being pursued long before officers searched the Ranger and seized the firearm. So too, Sanders's arrest after attempting to flee. Indeed, Zarra learned of the key piece of evidence—a plainly visible firearm in the Ranger's driver-side door jamb—just after stopping the vehicle and long before any potentially problematic search or seizure. Hr'g Tr. at 24:9–14; BC at 20:50:51–58. "Ordinary investigation[]" of this preexisting lead

and Sanders's criminal history would have inevitably led to the lawful seizure of the firearm under the plain view doctrine. *Watkins*, 13 F.4th at 1211 (citations omitted).

## IV. CONCLUSION

Accordingly, Defendant's Motion to Suppress (Doc. 26) is **DENIED**.

**ORDERED** in Tampa, Florida, on December 4, 2023.

Kathryn Kimball Mizelle
United States District Judge